UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TIFINY DAWN BRINER,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **A CIVIL ACTION** _____ |
| | § | |
| **JOSHUA INDEPENDENT** | § | |
| **SCHOOL DISTRICT,** | § | |
| **Defendant.** | § | **A JURY IS DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

**TIFINY DAWN BRINER**, Plaintiff herein, brings this action against **JOSHUA INDEPENDENT SCHOOL DISTRICT**, Defendant herein (hereinafter referred to as "Defendant," "JOSHUA ISD," or "JISD"), and in support would show the Court as follows:

### I.     NATURE OF THE CASE

1.     This is an action under the Americans With Disabilities Acts of 1990, the ADA Amendments Act of 2008, 42 U.S.C. §12101 *et seq.*, and the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §4301 *et seq.*, for unlawful employment practices based on disability, military status or service, and retaliation for asserting such rights.

2.     Plaintiff **TIFINY DAWN BRINER** ("Plaintiff," or "Briner"), who was employed by Defendant Joshua ISD, alleges that JISD discriminated against her on the basis of disability and military status or service, then retaliated against her for engaging in the protected activity of filing a complaint of discrimination to enforce such rights.

### II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, because this action

is based on the Americans with Disabilities Amendments Act of 2008, 42 U.S.C. §12101 *et seq.*, and the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §4301 *et seq.* – federal statutes presenting a federal question. This Court also has jurisdiction pursuant to 28 U.S.C. §1337, because the action is based on a federal statute regulating commerce.

4.      Venue is proper in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. §§1391(b)(2), because a substantial part of the events or omissions (Defendant's unlawful employment practices) giving rise to Plaintiff's claims occurred within the boundaries of the Joshua Independent School District, Johnson County, Texas, located within the territory of the Dallas Division.

### III.    PARTIES

5.      Plaintiff **TIFINY DAWN BRINER** is an individual residing in Johnson County, Texas.

6.      Defendant **JOSHUA INDEPENDENT SCHOOL DISTRICT** is a public school district and subdivision of the State of Texas with authority to sue and be sued in its own name. The District may be served with process by serving its Superintendent personally with a copy of the summons and this Plaintiff's Original Complaint at the primary business address of the District at 310 E. 18th Street, Joshua, Texas 76058, or wherever he/she may be found, and/or by serving any member of the Joshua ISD Board of Trustees with a copy of the summons and this Plaintiff's Original Complaint. Alternatively, the District may be served with process by certified mail, return receipt requested, to its primary business address: 310 E. 18th Street, Joshua, Texas 76058.

### IV.    FACTS

#### A) Overview of the Case:

7.      On October 26, 2021, during the performance of her regular duties as a teacher and supervisor in special education employed by Defendant Joshua ISD, Ms. Briner was assaulted by a special ed student in a Behavioral Intervention Classroom ("the assault"). The student ripped

window blinds from the wall and swung them at Briner and other teachers, among other violent behavior. As Briner ducked, the student let go of the blinds, which struck Briner in the back of the head.

8.    As a result of the assault, Briner suffered physical injuries to her head and to various parts of her nervous system, which physical injuries have resulted in numerous symptoms common to both concussions and post-concussion syndrome (PCS). To recuperate from these physical symptoms and avoid being at risk for another concussion before recovering, Briner applied for assault leave – a benefit guaranteed all school district employees by the Texas Legislature.

9.    In what she believed was a confidential and privileged conversation, Briner had mentioned to a school counselor at the ISD that Briner's prior existing condition of post-traumatic stress disorder (PTSD) had also been affected and speculated that might be making some of her physical symptoms worse. Unfortunately for Briner, the counselor (who is not a medical doctor, nor had she informed Briner their conversations would not be privileged or confidential) betrayed Briner's confidence and apparently reported to the District that all of Briner's physical symptoms were caused by her prior existing PTSD, and that none were a result of the assault. Joshua ISD used this information to deny Briner's assault leave request.

10.    Since then, Briner has presented Joshua ISD with substantial medical evidence over the last 2-3 years that Briner suffered a concussion and developed a condition called post-concussion syndrome (PCS), and that her symptoms are caused by physical injuries she suffered as result of the assault. Despite this volume of evidence, Joshua ISD has continued to deny appeals of its decision to deny assault leave, and continues to deny renewed requests for assault leave.

11.     Briner sues for both disparate treatment and disparate impact discrimination against her disability post-concussion syndrome, or PCS. Such discrimination is prohibited by the Americans with Disabilities Amendments Act of 2008, 42 U.S.C. §12101 *et seq.*

12.     Briner also sues for both disparate treatment and disparate impact discrimination against her past history and record of PTSD, as well as the fact that Joshua ISD apparently *regards* PTSD as a disability either preventing Briner from performing the essential functions of her job, or from receiving assault leave. Such discrimination is prohibited by the Americans with Disabilities Amendments Act of 2008, 42 U.S.C. §12101 *et seq.*

13.     Finally, Briner sues for both disparate treatment and disparate impact discrimination against her because of her past military service under the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §4301 *et seq.*

**B) Overview of Post-Concussion Syndrome (PCS):**

14.     A concussion is an injury to the brain that results in temporary loss of normal brain function. Medically, it is defined as a clinical syndrome characterized by immediate and transient alteration in brain function, including alteration of mental status or level of consciousness, that results from mechanical force or trauma.

15.     Concussions can be caused by direct trauma to the head, such as from falling, getting hit or being in an accident. Many people assume that concussions involve passing out or a loss of consciousness, but this is not true. In many cases, people with a concussion never lose consciousness. External signs of head trauma, such as bleeding, are often absent.

16.     Even mild concussions should not be taken lightly. Neurosurgeons and other brain injury experts emphasize that although some concussions are less serious than others, there is no such

thing as a minor concussion. A concussion can affect memory, judgment, reflexes, speech, balance and muscle coordination. Common symptoms of concussions include:

- Confusion
- Headache
- Vision disturbances (double or blurry vision)
- Dizziness or imbalance
- Nausea or vomiting
- Memory loss
- Ringing ears
- Difficulty concentrating
- Sensitivity to light
- Loss of smell or taste
- Trouble falling asleep

17.    Following a concussion, some patients suffer persisting symptoms, such as memory and concentration problems, mood swings, personality changes, headache, fatigue, dizziness, insomnia and excessive drowsiness for several weeks to months. This is known as post-concussive syndrome (PCS). Patients with post-concussive syndrome should avoid all activities that put them at risk for a repeated concussion.

18.    Concussion light sensitivity comes from dysregulation in one or more of four key areas: the thalamus, the autonomic nervous system (ANS), the vestibular system and the superior colliculus. The thalamus is a region in the brain that acts as a filter for all visual information. In post-concussion syndrome, something called the "neurovascular coupling" can become dysregulated, causing the brain to be overwhelmed by too much visual information. Since dark rooms have less visual information, they feel more tolerable to PCS victims. The autonomic nervous system (ANS) governs a host of processes, including heart rate, breathing, fight-or-flight response, blood pressure, and more. If the ANS becomes dysregulated during post-concussion syndrome, the pupils dilate and let in more light than they should, causing light sensitivity.

19.     The brain uses the inner ear vestibular system, the sense of sight, and the sense of touch, to determine a person's position in relation to his or her surroundings. A vestibular system malfunction can cause car sickness, difficulty balancing, or dizziness, but it can also cause light sensitivity when the brain registers a discrepancy between information from the vestibular system, the sense of sight, and the sense of touch. To compensate, the brain increases sensitivity in the sight system, for example, which leads to an overload of sensory information, resulting in light sensitivity. The superior colliculus is responsible for visual mapping and coordinating with other senses, and controls eye muscles. If dysfunctional, it can increase sensitivity to multiple senses, especially vision.

20.     PCS patients with light sensitivity often have problems with more than just one of the above-mentioned systems. Problems with one can trigger problems in the others, until it becomes impossible to tease out which system was the original culprit. Light sensitivity in PCS patients is not always constant – it can come and go, as part of a system cascade.

21.     Stress and exposure to bright light can exacerbate the physical impact on all of these major bodily functions. Some PCS patients cannot even tolerate ordinary incandescent light without sunglasses, no matter the status of their other symptoms.

   **C) Overview of Texas Teacher Assault Leave:**

22.     The Texas Education Code provides that a teacher who is physically assaulted during the performance of her regular duties is entitled (up to two (2) years) to the "number of days of days of leave necessary to recuperate from all physical injuries sustained as a result of the assault:"

> (b) In addition to all other days of leave provided by this section or by the school district, ***an employee of a school district who is physically assaulted during the performance of the employee's regular duties is entitled to the number of days of leave necessary to recuperate from all physical injuries sustained as a result of***

***the assault***…The period provided by this subsection may not extend more than two years beyond the date of the assault…[1]

(c) For purposes of Subsection (b), an employee of a school district is physically assaulted if the person engaging in the conduct causing injury to the employee:

(1) *could* be prosecuted for assault; or
(2) *could **not** be prosecuted for assault **only because** the person's age or mental capacity makes the person a nonresponsible person* for purposes of criminal liability.

TEX. EDUC. CODE §22.003(b) and (c).[2]

23.    Nowhere does the statute define neurological injuries as non-physical injuries. Neurological injuries, such as those suffered and sustained in post-concussive syndrome, are necessarily "physical injuries sustained as a result of the assault."

24.    Although Briner will show all of her symptoms are caused by physical injuries directly resulting from the assault, nowhere does the statute provide that when physical injuries cause psychological injuries, which then result in manifestations of additional physical injuries, such injuries are not physical injuries sustained as a result of the assault.

25.    Although Briner will show all of her symptoms are caused by physical injuries directly resulting from the assault, nowhere does the statute require that the teacher suffer only physical injuries and no psychological injuries.

---

[1] This leave is in addition to all other leave to which the teacher is entitled. "Notwithstanding any other law," income benefits received under a worker's compensation claim, if any, are to be coordinated with assault leave pay, so that together the two sources of compensation equal 100% of the teacher's weekly rate of pay. TEX. EDUC. CODE §22.003(b).

[2] Under Texas Penal Code §22.001(a) and (b), a person commits a Class A misdemeanor "assault" when he/she "intentionally, knowingly, or recklessly causes bodily injury to another." Under Texas Penal Code §22.002(a) and (b), a person commits 2nd Degree Felony Aggravated Assault when the bodily injury is serious or he/she "uses or exhibits a deadly weapon during the commission of the assault." TEX. PEN. CODE §22.001(a) and (b); §22.002(a) and (b).

26.    Although Briner will show all of her symptoms are caused by physical injuries directly resulting from the assault, nowhere does the statute limit recovery to include only physical injuries manifesting new symptoms the teacher never experienced prior to the assault.

27.    Although Briner will show all of her symptoms are caused by physical injuries directly resulting from the assault, nowhere does the statute preclude recovery of benefits if the assault exacerbates a pre-existing condition.

**D) Additional Background Facts:**

28.    Plaintiff Tifiny Briner grew up in Texas and, among other activities that made her well-rounded, she was a Texas Association of Future Educators member in high school. After graduating, she volunteered at Tarver Rendon Elementary, then worked at a local daycare. Briner later followed her desire to serve her country by joining the United States Army as a Chinook Helicopter Mechanic, graduating as a Distinguished Honor Graduate. Her first duty was in South Korea.

29.    While getting the foundations ready in South Korea for her husband to join her, Briner experienced a life-changing event – a sexual assault that resulted in what the United States Department of Veteran Affairs terms "military sexual trauma" (MST). According to the VA, it has surveyed every veteran seeking healthcare of any kind with the VA, and 1 out of every 3 women veterans reported experiencing military sexual trauma (MST), as opposed to only 1 out of 50 men. Briner served her company as a helicopter mechanic and later served on the staff of her Captain and First Sergeant. After her husband arrived in South Korea, they conceived their first child and she was reassigned stateside. They chose to raise their family in Texas and she was honorably discharged from the Army.

30.    Initially, Briner spent her time raising their daughter. With the expectation of their second child, the couple moved to Joshua in Johnson County, Texas. When their third child was born, Briner used the VA educational benefits she had earned to pursue her lifelong dream of becoming a teacher. She took courses at the local community college, then transferred to Southwestern Adventist University, where she graduated cum laude with departmental recognition.

31.    After earning her Bachelor of Science in Elementary Education, Briner studied and earned her teacher certification in special education, English as a second language, and gifted and talented – to ensure she was qualified to serve students of all abilities. Briner was honored to be hired by Venus ISD the year after she graduated. She taught 5th-grade Social Studies, where she earned Teacher of the Month and was later nominated for Teacher of the Year in 2017-2018. While she loved her students, district, staff, and school, Briner desired to work closer to home so she would have more time with her family in the evenings. She resigned from Venus ISD and began applying for positions closer to home.

32.    During the Summer of 2018, Briner started her Masters in Education in Curriculum and Instruction. While positions in local districts appeared few and far between, a friend reached out to her about a special education paraprofessional position at Elder Elementary in Joshua ISD. Briner soon found she had joined a team and department in her profession that would become her drive and passion for serving students. Briner started working as a paraprofessional in special education serving 3-5 year old students with a wide range of disabilities. While working as a paraprofessional, Briner interacted with students, teachers, and the staff who provided outside services such as physical and occupational therapies, as well as vision instruction. The wealth of knowledge Briner gained working as a paraprofessional even guided and influenced her learning and research as she completed her M.Ed and earned the honor of *Graduate with Distinction*.

33.    At the beginning of the 2019-2020 school year, Briner was hired to be the Life Skills Teacher at Loflin Middle School – another Joshua ISD campus. She loved working with Low Incidence Disability students, and when COVID-19 hit, she reinvented how to deliver instruction to students who could not independently access a computer or the internet.

34.    By the 2020-2021 school year, she learned to balance the wide needs of her students between in-person and distance learning. She worked diligently so students would have access to an effective sensory room with a wide variety of workstations. With collected data and research in collaboration with special services, she advocated ensuring students had access to practical technology and the PT and OT resources necessary for them to be successful, including a therapy table and wheelchair rocker for motor and sensory needs.

35.    In early March 2021, Briner was approached about taking over the centralized Behavioral Intervention Classroom at Loflin Middle School. Administration officials explained they believed Briner had the skills necessary to help those students and shape the program. Briner and Joshua ISD agreed she would take over BIC at Loflin in the Fall of 2021.

36.    In anticipation of the 2021-2022 school year, Briner constructed a system for teachers of three grades (6-8) to deliver assignments from multiple subjects to Briner's classroom for her students in the BIC room. Because students are still assigned to their home campus, this meant that Briner was initially navigating attendance and meetings across both Nichols and Loflin Middle School teachers. When numerous technical and systemic challenges arose in coordinating and administering these assignments, Briner collaborated with her assistant principal to come up with a way of getting assignments through Google Classroom in a centralized manner, which helped to better organize student learning.

37.    As can sometimes be a challenge with special needs students, as September progressed some of Briner's BIC students became more aggressive in their outbursts, and the need to separate certain students became apparent. Briner's classroom number was increased from two adjoined classrooms to three, allowing for a cool-down room so students would have space to self-regulate when they were escalated. Such changes, while necessary for the safety of students and staff, left staff stretched a little thin to have adequate coverage. Briner developed a stress-induced migraine but continued to come to work to ensure her paraprofessionals were not short-handed and left without proper staffing to meet the educational and behavioral needs of the students. Fortunately, Briner's migraine cleared up after a few days. She readdressed expectations with students and collaborated with others to find effective reinforcers to help students work towards completing their weekly assignments suitably and in a timely manner.

38.    The BIC at Loflin Middle School had a particular student with significant behavioral issues, such as verbally and physically assaulting staff and students, including a school resource officer. The student was suspended in early October and incidentally returned to school the following day, which led to a second assault on two staff members. When the student returned to on-campus learning, they[3] spent the first day with the special education director and a paraprofessional in a new classroom setting, increasing the number of classrooms Briner was now managing to four rooms.

39.    The next morning – October 26, 2021 – Briner was called to that student's classroom due to escalated behaviors: punching staff, hitting walls, kicking holes in the wall, throwing objects, and flipping a table. Upon entering the room, the student was cursing, punching and kicking the

---

[3] To protect the identify of and honor confidentiality regarding this minor with special needs, the student is not named, and gender identifying information has been removed.

walls. Using her education, training and experience, and employing standard behavior management techniques in which she was well versed, Briner attempted to de-escalate the student by speaking with them calmly and listening to what they were asking. Being highly agitated, the student made their wants clear – they did not want to be at school and wanted to go home.

40.    The student began trying to topple over a cabinet and kicking the walls, enlarging the hole they had already put in the sheetrock. The student yelled, "Is this enough? Will you suspend me already?!" and continued moving about the classroom. The student ripped window blinds from the wall and swung them at Briner and her staff members, letting go of the blinds as Briner attempted to duck, and the blinds struck Briner in the back of her head. Briner saw a quick "flash," and then the student threw the blind wand at a paraprofessional, striking her in the hand. The student then came at Briner from behind and punched her in the neck.

41.    At this time, Briner called for an administrator using a walkie-talkie. When the assistant principal (AP) arrived, Briner stepped out to apprise him of the situation, including the fact she'd been struck in the head, before the AP walked into the classroom. The student continued to punch and kick at staff members. The AP used a protection mat to block the punches, and at that time, the student threw a punch and said, "Ow!"  Briner called the school nurse for an examination and evaluation of the student, as they said their wrist/hand hurt. Afterward, the student calmed down enough that Briner and staff were able to resume the day.

42.    After debriefing with the AP, Briner went to the nurse's office for her own evaluation and to get the paperwork she needed to file an incident report. The nurse noted redness on Briner's scalp and two lines from where the blinds had struck her. Briner returned to the classroom to complete the paperwork and turned it in to the nurse later that day. The nurse asked if Briner would

be seen by a doctor, and Briner mentioned she had a follow-up with her physician coming up soon, as Briner at that time had only a mild headache. As the day went on, however, Briner continued to work as her headache increased. After getting home, Briner explained the day to her husband and told him if the headache continued in the morning, she would set up a time to be seen.

43.    Briner woke up the following morning with a splitting headache. She went to work because her group had a limited staff across four classrooms with multiple students, and because Briner herself had a scheduled follow-up meeting with the student who had assaulted her, their family, and the administration regarding expectations for that student moving forward. Briner did a web check-in with CareNow and informed her department lead she would need to leave to be seen and would require coverage in her class. As the day progressed, CareNow wasn't able to see Briner before the end of the day, so Briner informed her lead she would be going in the following day to be seen. On October 28, 2021, Briner came to work and was later called by CareNow to be seen, where CareNow diagnosed her with a concussion and head/cervical contusion.

44.    Unlike the stress migraine she'd had previously, Briner's post-concussion headache continued to persist daily with little relief. The following week, she continued to work daily with constant headaches. As that week progressed, Briner began noticing challenges throughout the day. Specifically, she had an internal shaking that started to become visible in her hands and legs – even her head would shake occasionally. Briner felt on edge – like her "fight or flight" was turned on. She had difficulty focusing on tasks, along with fatigue and significant changes in her emotions. She started having emotional bouts of irritability and uncontrolled crying, as though she couldn't control her own feelings. Briner continued to see the worker's comp doctor for follow-ups. She explained that her headaches were not responding to the medication and were persistent,

and she described her tremors and changes in behavior. The worker's comp doctor referred her for a CT scan.

45.     Over the weekend, Briner continued to see an increase in her symptoms, along with nightmares and issues with her speech sounding slurred at times. She put in for a sick day on November 8, hoping that some rest would help. She stopped by the school to ensure there was work in each student's folders for Monday. Later in November, Briner submitted a half-day absence for the morning, since she had an appointment for her CT scan. Briner went to work prior to the CT appointment to provide appropriate work for the day; she greeted students and left for her appointment. Although she had had CT scans in the past and knew what to expect, she nevertheless found that afterward she was unsettled and visibly shaking. Briner drove back to work, and she pulled into the parking lot of the school, Briner found it difficult to pull into her usual parking area, and she continued to drive to the front of the school. Briner did not yet understand what was happening to her. She was crying and did know why she was apprehensive about getting out of her vehicle to go inside. Briner called one of the school counselors and asked if they were allowed to assist teachers as well as students. She explained she was having a crisis-like event and asked if the counselor would talk with her. The counselor came out to Briner's van, and Briner cried as she explained she was having difficulty with her emotions, body tremors, and headaches, and she found it difficult to get out of her vehicle and go in.

46.     At this time, Briner knew very little about concussion symptoms or side effects; nor was she familiar with post-concussion syndrome (PCS). Even so, Briner made it very clear to the counselor she had never felt anything like this before – not even during her worst bouts of PTSD from the military. While Briner rarely confided in others about her MST/PTSD because it was deeply personal and she hadn't had difficulty with many of her symptoms for several years, in this

moment she believed she was speaking with someone in confidence and wanted her to understand how Briner's situation was impacting her life. Briner would later learn that her conversation was not confidential and became something Joshua ISD would use against her.

47.    After their talk, the school's counselor recommended Briner take some time and speak with the assistant principal (AP) about going home for the day. Briner collaborated with her department lead and the diagnostician to see if they could cover her Admission, Review and Dismissal (ARD) meetings the following day and went to speak with the AP. Briner explained the challenges she was having, and the AP was supportive of her taking some time off. Briner managed to drive home and tried to collect herself. Briner had a 6-month follow-up appointment scheduled off in the future with her personal physician, but she called and explained she needed to see them sooner because her worker's comp doctor would only address her headaches and she was now having several additional symptoms she'd never experienced before. Her personal physician saw her the next morning.

48.    Briner described the additional symptoms she had been experiencing since her assault. Instead of recognizing obvious signs of post-concussion syndrome (PCS), Briner's personal physical added PTSD as a symptom to her active conditions and listened as Briner provided the details of her school assault. Briner explained that her worker's comp doctor would not treat any of her symptoms beyond her persistent headaches, and detailed how she was experiencing body tremors, nausea, focus issues, night terrors, and fatigue. Briner's personal physician recommended she take the remainder of the week off and return to work on Monday if her symptoms improved. An antidepressant was added to her treatment – something she had not needed to be on for a few years, as her PTSD symptoms had previously improved so significantly. After leaving her personal

physician's office, from home Briner submitted her sick days for the remainder of the week and was notified by the principal that if she did not return on Monday, she would need to file for FMLA

49.     As the week progressed, Briner continued to have an increase in somatic symptoms beyond body tremors and headaches. Now she began to have balance challenges, light and sound sensitivity, and stiffness in her neck. It was becoming obvious she was not healing from the concussion as quickly as she should. Briner contacted her professional association, the Association of Texas Professional Educators (ATPE) and sought advice regarding her assault and the aftermath, including her worsening symptoms. Her contact at ATPE suggested Briner file for assault leave, as provided by the statute, so she did. Briner was informed that FMLA runs concurrently with assault leave, so she submitted a request to her personal physician's office to complete the FMLA packet, as he had listened to her issues and seemed to understand she needed additional care to manage her PCS symptoms. The following day, Joshua ISD's worker's comp insurance carrier  changed adjusters on Briner's claim, and on November 17 Joshua ISD denied Briner's assault leave – forcing her to use her personal and sick days. Briner returned to the CareNow clinic on November 18 to address her increase in symptoms and persistent headaches, and she asked to be referred to a neurologist. Again, the worker's comp doctor would only address her headaches and failed to treat the additional PCS symptoms brought on by the assault. Although Briner's request for a referral to a neurologist was sent "up the chain," Joshua ISD's worker's comp carrier denied the request as "unnecessary."

50.     Over the following months, Briner continued to experience body tremors, loss of balance, speech impairments, sensitivity to light and sound, challenges finding words, problems with speech, numbness in her right fingers, and memory issues. She attended worker's comp doctor's appointments and consistently requested to see a neurologist. These requests continued to be

denied.  Briner also attended appointments with her primary physician to continue to treat the breadth of her symptoms.

51.     After Joshua ISD denied Briner's assault leave, she filed a level one grievance, which Joshua ISD denied. The District's grievance decision focused heavily on personal accounts of staff members who saw Briner visibly upset and the  encounter with the school counselor Briner had confided in about her PTSD (which she had believed was confidential). The District never acknowledged the physical symptoms caused by Briner's concussion. Briner then filed a level two grievance with the superintendent. The added toll of having first to defend her assault injury and symptoms, and now her prior MST/PTSD disability from her military service, coupled with a complete lack of support from the school, the District, and the District's worker's compensation doctor, all left Briner feeling completely isolated and alone. Briner started counseling approximately a week after the level one decision, as she was dealing with night terrors and dark pervasive thoughts. She knew she would need additional support to address the impact of the assault and Joshua's lack of support on her health.

52.     The level two grievance decision was denied just after 2022 started, even as Briner's post-concussion symptoms continued to impact her daily life. Briner experienced excessive fatigue that left her taking frequent naps throughout the day, difficulty with coordination, concentration, and memory, muscle weakness in her right hand, persistent headaches, night terrors, and sensitivity to light and sound. To this day, Briner still cannot remember the days around Thanksgiving or Christmas of 2021. When she looks at pictures from that time, it is like looking at images that someone else took. Since the assault, Briner has had difficulty converting short-term memory into long-term memory, and her memory has significant gaps in time. Additionally, with worker's compensation denying income benefits, the District's denying her assault leave, and the District

having forced her to exhaust her personal and sick leave, Briner's family now faced significant financial hardship. Briner continued attending worker's comp doctor appointments and continued to request a neurology referral. At this point, CareNow referred her for an MRI which came back as unremarkable (it is very common for patients with PCS to have unremarkable CT's and MRI's).

53.     The worker's comp doctor changed Briner's headache medicine to topiramate, and Briner continued to have to work with her primary care physician and therapist to mitigate her post-concussion syndrome (PCS) and PTSD. Over the next few weeks, Briner sought legal help with her worker's comp claim, as she was caught in between her worker's comp doctor claiming that "insurance isn't approving" her neurology referral and the ISD's worker's comp insurance carrier claiming it had not received any request for a neurology referral.

54.     In March 2022, Briner attended an in-person Level 3 hearing on the denial of her assault leave, in front of the entire school board, the superintendent, and the district's legal team. During this hearing, Briner listened as the District ignored the doctors' diagnoses of PCS and the extensive list of her physical injuries and symptoms from her assault-related concussion, and instead proceeded to focus on her pre-existing PTSD. Briner trembled as she stood at the podium and looked at each of the board members through her sunglasses and described in detail her physical injuries and associated post-concussion symptoms and explained how they interfered with her daily life and her ability to return to work. The Joshua ISD school board voted unanimously that evening to uphold the level two decision of the superintendent and deny her assault leave.

55.     By this time, in addition to her never-ending post-concussion headaches, Briner's other persisting physical injuries and post-concussion symptoms now included fatigue, insomnia, tremors, headaches, numbness in her right hand, light and sound sensitivity, increased anxiety and

irritability, memory difficulties, concentration and focus, dizziness and balance, and decreased cognitive abilities. On March 28, 2022, Briner submitted paperwork to the District detailing she would be out due to her post-concussive symptoms. While it was approved on April 13, 2022, without the assault leave, her family would have to bear the financial cost.

56.    In early May 2022, Briner's request to change worker's comp doctors was approved, and the new worker's comp doctor clearly identified Briner's need to see a neurologist and indicated she was not physically able to return to the classroom. In the meantime, Briner continued to have post-concussion symptoms which limited her physical abilities to lift or move belongings.

57.    As the 2021-22 school year wrapped up, Briner's new worker's compensation doctor made the necessary referrals for proper evaluations and deemed that returning to work put Briner at further risk of injury and hindered her ability to recuperate from the concussion resulting from the assault. Briner requested the District reconsider approving her assault leave. In response, the District sent Briner for an Employee Physical Evaluation with the previous worker's compensation doctor who had failed to treat the extent of Briner's physical injury and accompanying symptoms.

58.    Briner checked in with CareNow online for the employee evaluation appointment, as CareNow had informed her she could not set up a scheduled time. Upon arriving, Briner was checked in and sat in the waiting area. She was already having difficulty in being in an environment where the staff had repeatedly refused to listen to her concerns and ignored her physical injuries and symptoms. It felt like an old wound was being torn open, as she had already changed doctors and begun receiving more accurate care. When Briner was called back, she provided the paper to the nurse along with her reason for being there. From here, the situation became very confusing

for Briner, as she detailed again what her post-concussion symptoms were and was doing what CareNow's staff asked of her.

59.    To Briner's shock, CareNow's nurse returned and indicated CareNow would not see Briner that day. Briner could not comprehend why the district would send her to a doctor who would refuse to see her for an evaluation. This initiated a panic attack, and Briner began arguing with staff as the district had told her to report there and the request had been specific to that treating doctor. After the staff continued to explain the doctor's refusal, Briner became overstimulated by the multiple voices, crying, persistent headache, and bright lights – all of which triggered a migraine that increased several additional symptoms over the following week.

60.    The District ultimately reached out to a different clinic and physician for the new assault leave evaluation. Briner took her husband to the appointment al after the issues she'd experienced at CareNow. While the evaluating doctor's opinion was that Briner should return to work "no earlier than deemed appropriate and cleared physically and emotionally for such duties by" her medical team, the District denied Briner's assault leave yet again, citing a single migraine she'd had at the start of the school year and claiming the symptoms she was experiencing were symptoms she'd had prior to the assault – a complete distortion of the truth.

61.    Over the summer of 2022 and well into the 2022-23 school year, the District never granted the reasonable accommodation of assault leave, and instead attempted several times to make other "accommodations" that completely failed to address the recommendations of Briner's medical team. In April 2023, Briner received a 4th-year probationary contract from Joshua ISD.

62.    By this time, an Administrative Law Judge with the Texas Department of Insurance's Worker's Compensation Division had now ruled in Briner's favor on the worker's compensation

claim – that all of her symptoms resulted from the work-related assault. As a result, Briner received back-pay compensation for a portion of her lost wages. Since the District's comp carrier still refused to provide Briner appropriate treatment recommended by its own and her doctors, Briner used a portion of the money and hired a functional neurologist, who confirmed the diagnosis Briner's primary care physician had made all along – she did indeed have post-concussion syndrome related to her October 26, 2021, assault.

63.    Despite now having overwhelming evidence of Briner's PCS, Joshua ISD again denied her assault leave, and she filed a Level 1 grievance. Apparently now unable to ignore or overcome the extensive medical evidence of Briner's PCS, the fact that returning to work would hinder her recovery and she required more time to recuperate, the District denied the Level 1 grievance citing the previous "confidential" communication regarding her prior existing condition of PTSD, and blaming Briner for the "delay" in seeking treatment for the PCS. Briner's Level 2 and Level 3 grievances met the same fate.

64.    Due in large part to the loss of income from the denial of her assault leave and the resulting financial strain on her family, Briner has been forced to forego therapies with her functional neurologist – therapies that had helped her regain stability and improve her visual challenges. Although private insurance has now refused to cover her therapy sessions with a counselor (because it has determined they are work-related due to the on-the-job assault), she still attends as many as she can. In short, Briner's family is facing severe financial distress and potential financial ruin, and this has resulted in substantial mental anguish in addition to the physical neurological symptoms from the assault itself. As explained in greater detail below, Briner asks this Court to compensate her for both the economic and non-economic damages she has suffered as a result of Joshua ISD's denial of her assault leave on the basis of her disabilities.

## V.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

65.    No administrative remedies are available or required to be exhausted for a USERRA claim. With respect to her disparate treatment and disparate impact disability discrimination claims under the Americans with Disabilities Amendments Act of 2008, 42 U.S.C. §12101 *et seq.*, Briner timely submitted a dually filed Charge on or about August 25, 2022, with the Texas Workforce Commission (TWC) and Equal Employment Opportunity Commission (EEOC), alleging disability discrimination.

66.    The TWC and EEOC cooperate with each other under a workshare agreement. Briner's Charge alleging discrimination was submitted within three hundred (300) days of the initial denial of her assault leave, and well within three hundred (300) days of the period of Joshua ISD's continuous action of denying her assault leave. The Charge was investigated by TWC under the workshare agreement between TWC and the EEOC.

67.    When Joshua ISD failed to resolve this matter at the administrative level, TWC closed its investigation and the EEOC issued Briner a right to sue letter, which she received on December 4, 2023. Briner timely files this lawsuit prior to the expiration of ninety (90) days after receiving her EEOC right to sue letter.

## VI.    CAUSES OF ACTION

### A) COUNT 1: ADA Disability Discrimination: Denial of Assault Leave – Disparate Treatment.

68.    Defendant Joshua ISD is an "employer" as defined under the Americans With Disabilities Acts of 1990 and the ADA Amendments Act of 2008.

69.    Post-concussion syndrome (PCS) is a "disability" within the definition provided by the ADA, and Briner would show the Court and jury that the symptoms caused by her PCS, from which she must fully recuperate before returning to work, were a result of the assault. Briner was a qualified individual

and at all times fully capable of performing the essential functions of her job. Joshua ISD therefore discriminated against Briner in the form of disparate treatment – that is, the denial of her statutory assault leave benefit to recuperate from her physical injuries, because of her PCS disability.

70.    In the alternative or in addition, post-traumatic stress disorder (PTSD) is a "disability" within the definition provided by the ADA. Briner was a qualified individual and at all times fully capable of performing the essential functions of her job. Briner would show the Court and jury that Joshua ISD denied her assault leave because of her history or record of PTSD. Joshua ISD therefore discriminated against Briner in the form of disparate treatment – that is, the denial of her statutory assault leave benefit to recuperate from her physical injuries, because of her disability – that is, her history or record of PTSD.

71.    In the alternative or in addition, the jury may find that Joshua ISD's true motive was that it *perceived, or regarded* Briner as disabled because of her past PTSD diagnosis and denied her assault leave for that reason. Either way, Joshua ISD's adverse actions toward Briner's employment constitute disparate treatment disability discrimination under the ADA and the ADAAA. Plaintiff has a private cause of action and sues for disability discrimination under 42 U.S.C. §12101, *et seq.*

**B) <u>COUNT 2: ADA Disability Discrimination: Denial of Assault Leave – Disparate Impact</u>.**

72.    To establish a discrimination claim based on disparate impact rather than disparate treatment, a Plaintiff must:

> 1) isolate and identify the specific employment practice challenged ("facially neutral policy");
> 2) demonstrate any observed statistical disparity that the practice has on the protected class; and
> 3) demonstrate a causal link between the identified practice and the demonstrated disparity.

*Smith v. City of Jackson*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (extends Title VII disparate impact to ADEA); *Connecticut v. Teal*, 102 S.Ct. 2525, 457 U.S. 440, 448 (1982)

(setting forth elements for Title VII disparate impact); *Griggs v. Duke Power Co.* 91 S.Ct. 849, 401 U.S. 424, 431 (1971) (establishing disparate impact in Title VII claims).

73.     The ADA and Americans with Disabilities Amendments Act of 2008 are also subject to disparate impact analysis. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 733 (9th Cir. 2021); *Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 677–79 (E.D. Pa. 2022).

74.     Joshua ISD's policy or practice of treating light sensitivity and other symptoms as not being "physical injuries," and its policy or practice of insisting these symptoms resulted from Briner's past military sexual trauma and PTSD, demonstrate facially neutral policies or practices.

75.     Briner would show these facially neutral policies or practices have a significant adverse impact on teachers or other school district employees who suffer from PCS or have a history of PTSD, because they are statistically less likely to receive their statutory assault leave benefit.

### C) <u>COUNT 3: USERRA Discrimination: Denial of Assault Leave – Disparate Treatment</u>.

76.     Defendant Joshua ISD is an "employer" under the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §4301 *et seq.*

77.     By attributing Briner's physical symptoms to her PTSD, which resulted from the military sexual trauma she experienced while a member of the United States Armed Forces on active duty, Joshua ISD discriminated against Briner because of her military service. This is a violation of the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §4301 *et seq.*

78.     Briner was subjected to discrimination based on her past membership in the United States Army, such that her prior service altered the terms and conditions of her employment relationship with Joshua ISD, and it caused all of the above-described harm to her. Joshua ISD's actions

violated the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §4301. *et seq*. These violations caused Briner to lose wages and benefits.

79.    Because Joshua ISD's actions were willful, Briner is also entitled to an award of liquidated damages in a like amount of the assault benefit lost.

### D) COUNT 4: USERRA Discrimination: Denial of Assault Leave – Disparate Impact.

80.    The United States Supreme Court continues to expand disparate impact liability by finding disparate impact applies to statutes that do not explicitly provide for disparate impact liability. *See, e.g., Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 125 S.Ct. 2507, 192 L.Ed.2d 514 (2015) (applying disparate impact analysis to discrimination claim under the Fair Housing Act, 42 U.S.C. §3601, *et seq*.

81.    Joshua ISD's policy or practice of treating light sensitivity and other symptoms as not being "physical injuries," and its policy or practice of insisting these symptoms resulted from Briner's past military sexual trauma and PTSD, demonstrate facially neutral policies or practices.

82.    Briner would show these facially neutral policies or practices have a significant adverse impact on former members of the United States Armed Forces because, according to the United States Department of Veteran Affairs, military veterans are statistically more likely to suffer from PTSD than ordinary citizens.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Tifiny Briner respectfully requests the following relief:

 a.    Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with Defendant, from discriminating against other employees because of sex (gender), race, color, age, disability, military service, or any other legally protected characteristic, or retaliating against those who oppose such discriminatory practices or participate in or provide information in investigations of such

complaints;

b.  Order Defendant to make Briner whole by reinstating her to her former position (once her medical team has cleared her), with all seniority, salary, benefits, retirement eligibility and any other employee statuses completely restored, including the statutory assault leave to which she is entitled;

c.  Order Defendant to make Briner whole by providing compensation for past and future pecuniary and economic losses resulting from Defendant's unlawful practices described above, including but not limited to back pay, front pay, health and other fringe benefits and pecuniary harm resulting from the loss of such benefits, as well as the pecuniary harm to Briner's retirement contributions, vesting, draw schedule, or any other pecuniary loss, including the statutory assault leave to which she is entitled;

d.  Order Defendant to make Briner whole by providing compensation for non-pecuniary losses resulting from the unlawful practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of self-esteem, loss of civil rights and nominal damages, in an amount to be determined at trial;

e.  Order Defendant to pay Briner's litigation costs and expenses, including reasonable attorneys' fees, expert witness fees, and pre-judgment and post-judgment interest; and

f.  Grant such further relief as the Court deems necessary and proper in the public interest.

## **DEMAND FOR JURY**

Plaintiff demands trial by jury of all issues of fact raised by this Complaint.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
**TAYLOR LAW FIRM, PLLC**
***taylorlawfirmdfw@gmail.com***
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700

**ATTORNEYS FOR TIFINY DAWN BRINER**